**PIERCE FORD SALES, INC., and Elmer W. Bemis, Trustee in Bankruptcy, Plaintiffs-Appellees,**

v.

**FORD MOTOR COMPANY, Defendant-Appellant.**

**No. 6, Docket 26547.**

United States Court of Appeals
Second Circuit.

Argued Nov. 13, 1961.

Decided Feb. 5, 1962.

**426**

Fitts & Olson, Brattleboro, Vt., for appellant; Whitney North Seymour, New York City (Simpson Thacher & Bartlett, New York City), and Richard B. Darragh and Richard I. Fricke, Dearborn, Mich., of counsel.

A. Luke Crispe, Brattleboro, Vt., for appellee, Pierce Ford Sales, Inc.

John S. Burgess, Brattleboro, Vt., for appellee Elmer W. Bemis, Trustee in Bankruptcy.

Before SWAN, MOORE and SMITH, Circuit Judges.

SWAN, Circuit Judge.

This is an appeal by Ford Motor Company (Ford) from a judgment for Pierce Ford Sales, Inc. (Pierce) and its trustee in bankruptcy, in an action to recover damages for allegedly wrongful conduct by Ford which prevented Pierce from disposing of its dealership contract with

Ford.[1] The amended complaint contains two counts, one based on the Automobile Dealer Suits Against Manufacturers Act, 15 U.S.C.A. §§ 1221–1225; the other on the common law doctrine of unjustifiable interference with business expectancies. The case was tried to a jury, whose verdict awarded compensatory damages of $10,000., and exemplary damages of $13,-850. Ford has appealed from the denial of its motions for a directed verdict and for judgment notwithstanding the verdict. The order denying Ford's motion for judgment n. o. v. contains a brief opinion.[2]

Since the statutory cause of action (count 1) does not authorize punitive damages, and the jury was so charged, it is obvious that the verdict, at least insofar as it awarded exemplary damages, was rendered on the common law cause of action (count 2). That count will be first considered.

 We agree with the district court's statement of the law applicable to count 2, but we cannot agree that the evidence will support any recovery by plaintiffs under that count. In considering the evidence the appellant concedes, as obviously it must, that the evidence must be viewed in the light most favorable to the plaintiffs. Consequently we shall accept the appellees' statement of the evidence whenever support for it appears in the record.

In 1952 Pierce acquired the Ford dealership for Brattleboro, Vermont. For several years the business prospered but later additional working capital was needed. In November 1957 Pierce requested Ford to assist in finding a person with adequate capital to become a part owner of Pierce, and was told that Ford would not do anything about getting people interested unless Pierce signed a form letter supplied by Ford giving notice of "intent to terminate" the dealership. Such a letter was executed about December 18, 1957. The letter provided that the dealership agreement should be terminated, if (1) Pierce sold its assets, and (2) Ford executed a dealership agreement with the purchaser. The letter also stated that "because of your legitimate concern with the character, ability and finances of dealers in your products, you have the right to decline, in your discretion, to enter a Sales Agreement with any person who may be willing to agree to purchase our assets."

The evidence concerns three negotiations of Pierce with prospective purchasers in none of which was a contract consummated. The first two negotiations involved the sale of Pierce's assets. The third involved the sale by stockholders of their stock in Pierce.

The first negotiation was with Calvin W. Cole. Mr. O'Halloran, a representative of Ford, indicated that Cole would be acceptable as a Ford dealer, and a

1. When the action was commenced in the summer of 1958 the plaintiffs were Pierce Ford Sales, Inc., a Vermont corporation, its receiver in bankruptcy, and three stockholders of the corporation. Subsequently the trustee in bankruptcy was substituted for the receiver, and the stockholder plaintiffs were dismissed as parties.

2. The opinion reads in part as follows:
"The argument that the tort of interference with a business relationship applies only to already existing contracts must be denied. Intentional interference with contract negotiations or a business expectancy became a tort in English common law at least as early as 1793 when the landmark case of Tarleton v. McGawley was decided by the King's Bench. Section 766 of the Restatement of Torts states that 'one who, without a privilege to do so, induces or otherwise purposely causes a third person not to * * * (b) enter into * * * a business relation with another is liable to the other for the harm caused thereby.' The common law of nearby states makes the tort of interference with a business relationship applicable to contract negotiations. E. g., Russell v. Croteau, 98 N.H. 68, 94 A.2d 376 (1953), and Goldman v. Feinberg, 130 Conn. 671, 37 A.2d 355 (1944). Though there is no Vermont case in point, it is reasonable to conclude that were the Vermont Supreme Court faced with the question, it would follow the weight of authority and reason."

contract was drafted, dated February , 1958, for the purchase by Cole of all Pierce's personal property, other than used cars, located upon its garage premises. The price was to be the fair market value of the property as determined by New England Stock Control Company (Control) of Milton, Massachusetts. Pierce expected Control's appraisal would be about $24,000. In fact it was substantially less. The contract was never signed, and the reason the deal fell through, as testified by Attorney Oakes, was because Pierce began negotiating with Mr. Ratti.

Mr. Pierce initiated negotiations with Mr. Ratti on February 6, 1958, the day before the agreement with Cole was to be signed. It was also before Mr. Pierce knew the amount of Control's appraisal. Mr. Ratti, Mr. Pierce and Mr. O'Halloran met at the Pierce plant. Mr. O'Halloran stated that he thought Mr. Ratti would be more acceptable to Ford than Mr. Cole, and doubted that Cole would be approved. As a result, Mr. Pierce "just forgot about" the Cole transaction. The three men then went to the office of Mr. Ratti's attorney, Mr. Gale, who prepared an agreement for the purchase by Ratti of Pierce's personal property. This also provided for appraisal by Control. In addition, Mr. Gale was to prepare a lease of the garage premises, which were owned by Mr. Pierce and his wife, and an option to buy the premises was to be agreed upon and signed by the parties. The next morning the parties met at Mr. Gale's office with Attorney Kristensen, who had been called in to represent Pierce. He advised Pierce not to sign, as he feared Pierce might become involved in a breach of contract suit with Cole. He testified also that O'Halloran and Ratti appeared to be putting pressure on to get the contract signed at once, and this made him refuse to let the deal go through so fast. The deal was dropped after Pierce learned the amount of Control's appraisal and would not sell at that figure.

From the foregoing statement of the evidence most favorable to the plaintiffs, we think it obvious that the jury could not properly find, under the common law theory of count 2, that Ford tortiously interfered with Pierce's business relations with either Cole or Ratti. Indeed, appellees' brief leaves us in doubt as to precisely what are Pierce's claims of wrongful interference. It seems to be suggested that Ford did wrong in refusing to assist in finding a purchaser until the "intention to terminate" the dealership was executed. But we know of no common law doctrine which requires one party to assist the other to sell his assets in the absence of a contractual obligation to assist him. Another complaint seems to be that Ford ascertained from Control and disclosed to Cole that the amount of Control's appraisal would be less than Pierce expected. Such disclosure to Cole, if assumed to be true, despite Cole's testimony that he obtained the information directly from Control, would have made Cole the more willing to consummate the deal. The disclosure could not have caused damage to Pierce, unless it sold at the appraisal figure. It did not. Pierce itself terminated the negotiations with Cole in order to deal with Ratti. Apparently there is also a contention that Ford influenced Control to change its formerly used method of appraisal in order to produce a lower appraisal. We can find not even a scintilla of evidence that Ford had, or exercised, any influence over Control. Moreover, had Ford influenced the appraisal, this could not have damaged Pierce unless it sold at the lower appraisal. But by plaintiffs' own testimony Pierce broke off negotiations with Cole in order to deal with Ratti, delayed signing the Ratti contract on the advice of its attorney, and it was Pierce's own unwillingness to sell at Control's figures that prevented later resumption of the Cole or Ratti negotiations. Finally it seems to be urged that Mr. O'Halloran interfered by expressing the opinion that Ford would be more likely to approve a sale to Ratti than to Cole. Since Ford was to execute a dealership agreement with the purchaser and might, in its discretion, decline to do so, O'Hal-

loran's expression of opinion cannot be deemed unlawful interference. With Ratti, as with Cole, non-consummation of the negotiations was caused by Pierce's unwillingness to sell its assets at Control's valuation.

After failure of the preceding negotiations, Pierce, its directors and stockholders began negotiations with Ray Brown, the general manager of a Ford garage in Wilmington, Vermont. These negotiations resulted in a letter, dated March 8, 1958, addressed to Brown by Pierce's attorneys (Exhibit 15). The letter recites that the directors have offered to put Brown in charge of the entire business at a weekly salary of $150., and in addition to give him an annual bonus of 33⅓ per cent of the net corporate profits after taxes, which he was to use to purchase the 249 shares of stock presently outstanding. He was to put in immediately $5,000. to acquire 50 new shares of stock in order to provide new working capital for the corporation, which would also raise an additional $5,-000. of working capital by a bank loan. The stockholders of the presently outstanding 249 shares would agree to sell their stock at $100. per share, and Brown would have 10 years in which to accomplish the purchase, dividends in the meantime to be distributed to the stockholders. Mr. and Mrs. Pierce, owners of the real estate on which the corporate operations were conducted, were to lease the premises to the corporation at $625. per month for a term of five years, with a five year renewal period at an adjusted rental. The letter concludes as follows: "Needless to say, our proposed arrangements are entirely conditioned upon approval of the Ford Motor Company, an approval which both we and you have been led to believe would be forthcoming as a result of your established reputation as a dealer in Wilmington." A copy of this letter was sent to Mr. Sweeney, who had succeeded Mr. O'Halloran as Ford's representative in the area, and Mr. Sweeney came to Brattleboro on March 19, 1958. He informed Pierce's attorney that Brown's character and ability

made him acceptable as a Ford dealer but that the price was too high and therefore Sweeney would recommend to Ford disapproval of the contract. This resulted in a new contract being drafted, dated April 1, 1958, which reduced by $5,000. the price to be paid by Brown, extended to 10 years his period of employment, and was slightly more favorable with respect to the terms of employment (Exhibit 16A). This contract was also expressly made subject to approval by Ford. Mr. Sweeney again indicated that the price was too high for Brown to operate successfully. After discussion with Mr. Sweeney's superior, Mr. O'Brien, Brown notified Pierce's attorney that he would not sign the agreement.

In the negotiations with Brown representatives of Ford actively participated. They told him that the price was too high, and expressed the opinion that Ford would not grant him a dealership contract if he purchased on the proposed terms. The appellees contend that it was "none of Ford's business" what price Brown was to pay. We disagree. The greater the obligations he assumed, the greater the likelihood of his having future financial difficulties. Not only was the proposed contract expressly conditioned on Ford's approval but even without such a condition Ford would be justified in protecting its own interest to have a dealer financially sound. Under the common law doctrine, interference is actionable when one who, *without a privilege to do so,* purposely causes a third person not to enter into a business relation with another. Restatement of Torts § 766. See also A. S. Rampell, Inc. v. Hyster Co., 3 N.Y.2d 369, 144 N. E.2d 371, 375 where the New York Court of Appeals states that "interference with pre-contractual relations is actionable where a contract would have been entered into had it not been for the malicious conduct of a third person." Certainly there was no evidence of malicious conduct by Ford's representatives. On the contrary Ford had a privilege to give the advice it gave. Moreover, such advice was not

the proximate cause of Brown's failure to enter into the proposed contract. He testified that he made up his own mind largely on the basis of the many repossessions with which Pierce dealership was afflicted.

■ We turn now to consideration of the statutory count. The evidence relied upon is the same as that recited in our discussion of the common law count. Section 1222 of Title 15 U.S.C.A. gives an automobile dealer the right to "recover the damages by him sustained * * * by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer * *." Section 1221(e) defines what the Act means by good faith:

> "The term 'good faith' shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

The conduct which the statute proscribes is "coercion, intimidation, or threats of coercion or intimidation," and the Proviso is explicit that "recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." Indeed, appellees' brief concedes that "good faith" is limited to acts of "coercion," and cites with approval Professor Kessler's discussions of Coercion in 66 Yale L.J. 1135 and 69 Yale L.J. 1.

Several district courts and one court of appeals have construed the statute and all recognize that there can be no recovery by the dealer in the absence of coercion, intimidation or threats thereof by the manufacturer.[3] The legislative history of the Act is also enlightening.[4] Since, as shown by the House Report, the Act imposes no obligation to preserve an inefficient dealership it certainly imposes none to accept a dealership overburdened with liabilities at its inception. Hence a manufacturer may refuse to accept a person as a dealer because of an honest belief that the prospective dealer lacks either the ability or the financial resources to be a successful dealer. Thus Ford was under no obligation to give Brown a franchise loaded with repossessions and with long term liabilities for purchase of the stockholders' stock. And Ford's refusal to accept Brown could not be a breach of good faith as to Pierce.

■■ No bad faith on the part of Ford or its employees is shown. It was not their conduct but that of Pierce itself which caused non-consummation of the negotiations with Cole and Ratti. In the case of Brown there is nothing which bears any resemblance to coercion or intimidation. Mr. Sweeney expressed the opinion that the price was too high for Brown to operate successfully. Such argument was within the permission of the Proviso to § 1221(e), and Brown him-

---

3. See Woodard v. General Motors Corp., 298 F.2d 121 (5 Cir., 1961); Staten Island Motors, Inc. v. American Motors Sales Corp., 169 F.Supp. 378, 382 (D. N.J.1959); Pinney & Topliff v. Chrysler Corp., 176 F.Supp. 801, 809–810 (S.D. Cal.1959); Barney Motor Sales v. Cal Sales, Inc., 178 F.Supp. 172 (S.D.Cal. 1959); Leach v. Ford Motor Co., 189 F.Supp. 349 (N.D.Cal.1960); Blenke Bros. Motors, Inc. v. Chrysler Corp., 189 F.Supp. 420 (N.D.Ill.1960).

See also Professor Kessler's discus-

sions in 66 Yale L.J. 1135, at 1177–1180, and 69 Yale L.J., at 103–107.

4. See House Report No. 2850, 84th Cong., 2d Sess. Vol. 3, U.S.Code Cong. & Adm. News 1956, p. 4596 at 4603:

"The bill, however, does not prohibit the manufacturer from terminating or refusing to renew the franchise of a dealer who is not providing the manufacturer with adequate representation. Nor does the bill curtail the manufacturer's right to cancel or not to renew an inefficient or undesirable dealer's franchise."

self made his own decision and notified Pierce's attorney that he would not make the purchase.

A verdict for the defendant should have been directed, and the motion for judgment n. o. v. should have been granted. Accordingly the judgment is reversed and the cause remanded with direction to grant said motion. No appellate costs are awarded.