**GENERAL MOTORS CORPORATION,**
a corporation, Plaintiff,

v.

**The MAC COMPANY, a corporation,
Defendant.**

Civ. A. No. 7989.

United States District Court
D. Colorado.

Nov. 9, 1965.

Hodges, Silverstein & Harrington, Denver, Colo., for plaintiff.

Hindry, Erickson & Meyer, Denver, Colo., for defendant.

WILLIAM E. DOYLE, District Judge.

This matter is before the Court on motions for summary judgment of General Motors Corporation directed to three counterclaims of the defendant.

The action was filed May 7, 1963, under the 1946 Trademark Act, Title 15 U.S.C. § 1051 et seq. Relief is sought by General Motors against the alleged improper use of Chevrolet trademarks by the defendant MAC Company. A temporary injunction was entered; however, the issues raised by the complaint have not been determined and are not here considered. On June 13, 1963, defendant filed its answers and three counterclaims. The latter were based upon provisions of the 1956 Automobile Dealers Franchise Act, Title 15 U.S.C. § 1221 et seq. General Motors then answered the counterclaims and, following extensive discovery on both sides, filed the present motion for summary judgment.

Through discovery General Motors sought to expose the factual contentions of defendant MAC Company, while defendant sought evidence to support its contentions of unfair dealings by General Motors.

The *first* counterclaim charges that General Motors did not act in good faith in terminating a Chevrolet Dealer Franchise Agreement with the Mac Chevrolet Company of Espanola, New Mexico.

The *second* counterclaim alleges that General Motors failed to act in good faith in its refusal to renew a Chevrolet Dealer Franchise Agreement with the McMullen Company of Alamosa, Colorado.

Counterclaim *three* alleges that General Motors has failed to act in good faith in the performance of its contractual duties under a Buick Dealer Franchise Agreement now in effect with the McMullen Company.

The Mac Chevrolet Company of Espanola and the McMullen Company assigned their claims to the defendant here. General Motors, in response to the first counterclaim, alleges it acted in good faith in terminating the Espanola dealership; that it did so for cause under express provisions of the agreement. Responding to the second counterclaim, General Motors maintains it acted in good faith in refusing to renew the Alamosa Chevrolet dealership; that this termination resulted from a poor sales performance. Finally, in answer to the third counterclaim General Motors alleges it has acted in good faith under the Alamosa Buick dealership agreement. Other defenses are not here important.

In addition to the pleadings there are before us depositions, answers to inter-

rogatories, admissions and affidavits. Over fourteen hundred pages of depositions, in excess of one hundred seventy exhibits, and extensive briefs have fully exposed the several controversies. Thus, there has been thorough exploration and the case would appear to be ripe for the entry of summary judgment, absent substantial disputes with respect to material matters.

It is clear, of course, that substantial doubts are to be resolved in favor of the non-moving party and that the summary judgment remedy is to be employed with care. Zampos v. United States Smelting, Refining and Mining Co., 10 Cir., 1953, 206 F.2d 171. On the other hand, where from careful examination of all evidentiary matters presented there can be no reasonable doubt as to the existence of a genuine issue as to material facts, the device of summary judgment is an appropriate method for the disposition of a case. See Alaniz, Administrator, etc. v. United States, 10 Cir., 1958, 257 F.2d 108.

Some discussion of the pertinent provisions of the act as they affect this present litigation is in order.[1]

This legislation was enacted in recognition of the disparity of economic power between automobile manufacturers and dealers and in recognition of alleged misuse by manufacturers of their power in relationship to franchised automobile dealers. A new remedy against unfair practices was provided. See Woodard v. General Motors Corp., 5 Cir., 1962, 298 F.2d 121.

The several cases decided under this act have been examined and, surprisingly, plaintiff dealers have been singularly unsuccessful. No doubt, this stems from the unusual character of this legislation—seeking as it does to regulate at least a limited phase of bargaining and contracting. There are a total of seven decisions by courts of appeal: three of these reversed district court decisions and entered judgments for defendant manufacturer;[2] two affirmed judgments entered on directed verdict for the

---

1. Title 15 U.S.C. states in part:
   Section 1221. *Definitions:*
   As used in this chapter * * *
   (b) The term 'franchise' shall mean the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract.
   (c) The term 'automobile dealer' shall mean any person, partnership, corporation * * * resident in the United States or in any Territory thereof * * * operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons * * *
          *   *   *   *
   (e) The term 'good faith' shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

   Section 1222. *Authorization of suits against manufacturers; amount of recovery; defenses:*
   An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

2. Pierce Ford Sales, Inc. v. Ford Motor Co., 2 Cir., 1962, 299 F.2d 425, cert. denied 371 U.S. 829, 83 S.Ct. 24, 9 L.Ed. 2d 66 (1962); Garvin v. American Motors Sales Corp., 3 Cir., 1963, 318 F.2d 518; Globe Motors, Inc. v. Studebaker-Packard Corp., 3 Cir., 1964, 328 F.2d 645.

manufacturer;[3] one affirmed a judgment in favor of the manufacturer;[4] and one affirmed a summary judgment for the manufacturer.[5] From a reading of these cases it must be concluded that the act has not been interpreted in a way which substantially interferes with or modifies normal contract negotiations between the manufacturer and the dealer.

■ The essential requirement of the act is the exercise of "good faith." Furthermore, the cases hold that coercion and intimidation, or threats thereof, must be proven in order to show bad faith within the prohibitions of the act. Pierce Ford Sales, Inc. v. Ford Motor Co., 2 Cir., 1961, 299 F.2d 425, 430; Globe Motors, Inc. v. Studebaker-Packard Corp., 3 Cir., 1964, 328 F.2d 645. Argument and persuasion are not ruled out and hard bargaining does not of itself subject a manufacturer to liability. Indeed, a manufacturer is not prohibited from enforcing just and reasonable contract provisions even though the same appear burdensome to dealers. It is not enough for a dealer to show inequitable results; he must also show coercive or intimidating treatment, or threats thereof.

■ Counsel for defendant argue that a subjective meaning should be given to the term "coercion." The effect of this would be that any act tending to frighten or upset any given dealer must be presumed coercive. However, in our view this term implies a more objective criterion. It demands conduct on the part of the manufacturer which amounts to coercion and which results in the dealer's acting or refraining from acting against his will. With these criteria in mind we proceed to a consideration and analysis of the facts surrounding the alleged violations.

## I.

Counterclaim One deals with the cancellation of the franchise of the Mac Chevrolet Company of Espanola, defendant's assignor. From the evidence before us it appears that on September 1, 1954, the Chevrolet Division of General Motors first entered into a dealership contract with Mac Chevrolet. This agreement was renewed four times; the last renewal having been on November 1, 1960, for a term of five years. As is customary, a detailed booklet accompanied and supplemented the primary contract. Paragraph III emphasizes the personal service character of the agreement and lists the names of the participants together with their share in ownership and management. Prior written approval of Chevrolet Division is required in order to change ownership, financial interest, or active management.

The termination date set forth in the contract was October 31, 1965, subject to earlier termination as provided in Section 18 of the booklet. This has to do with a dealer's right to terminate without cause on one month's written notice and Chevrolet Division's right to terminate for cause. The termination here in issue was based on Section 18, paragraph B(4) (c) and (d).[6]

3. Milos v. Ford Motor Co., 3 Cir., 1963, 317 F.2d 712, cert. denied 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 125 (1963) ; Abbott-Stansell Motor Co. v. Chrysler Motor Corp., 5 Cir., 1964, 333 F.2d 322.

4. Kotula v. Ford Motor Co., 8 Cir., 1964, 338 F.2d 732, cert. denied 380 U.S. 979, 85 S.Ct. 1333, 14 L.Ed.2d 273 (1965).

5. Woodard v. General Motors Corp., 5 Cir., 1962, 298 F.2d 121, cert. denied 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962), rehearing denied 370 U.S. 965, 82 S.Ct. 1584, 8 L.Ed.2d 834 (1962).

6. The pertinent provisions are as follows:

B. *Termination for cause* * * *
(4) Chevrolet may terminate this Agreement immediately by delivering to Dealer or its representative written notice of such termination in the event of the happening of any of the following:
\* \* \* \* \*
(c) * * * or any sale, transfer, relinquishment, voluntary or involuntary, by operation of law or otherwise, of any interest in the direct or indirect ownership or active management of Dealer without the prior written approval of Chevrolet.
(d) Any dispute, disagreement or controversy between or among principals, partners, managers, officers or stockholders of Dealer which may adversely affect the ownership, operation, management, business or interest of Dealer or Chevrolet.

The contract of November 1, 1960, which was terminated showed Walter W. McMullen and C. A. Cimino as Paragraph III named participants. Both then and at the time of the original 1954 agreement McMullen also owned a Chevrolet dealership in Alamosa. This despite the fact that General Motors frowns on multiple franchises. In circumstances similar to McMullen's 1954 situation some form of buy-out agreement looking to divestiture of the second dealership is usually required. The original proposal of McMullen and Cimino represented that the former would have seventy-four per cent. of the stock and Cimino would have twenty-four per cent.; that Cimino had sufficient funds to purchase his proposed interest; that Cimino would manage the franchise; and that McMullen would sell his capital stock holdings to Cimino within a period of five years or more, provided the profits, etc., permitted Cimino to make the purchase. Notwithstanding this and unknown to Chevrolet, by separate agreement McMullen and Cimino agreed that the latter would purchase no more than forty-nine per cent. of the shares of stock. It also appears from the record that the funds attributed to Cimino were really those of McMullen.

General Motors did not initiate the events leading up to the termination of this agreement. The termination was the result of a feud between McMullen and Cimino. The latter personally notified Chevrolet Division of the quarrel at its El Paso zone office on April 25, 1961.

When the disagreement culminated in Cimino's termination on April 28, he informed Chevrolet Division by letter that he was no longer participating in the Mac Chevrolet management.

In March, 1961, in the course of a meeting between McMullen and Chevrolet Division's Central Office representatives about the Alamosa dealership, Chevrolet Division first learned that certain statements in the original 1954 proposal of Cimino and McMullen leading to the grant of the Espanola franchise had been false. Chevrolet Division did not take action as a result of this. It was only after a later meeting held at Santa Fe, New Mexico, with Cimino and McMullen that the termination occurred.

At this meeting, held on June 14, 1961, efforts were made to resolve the situation. These were unsuccessful. The resulting termination was based upon violation by Mac Chevrolet of the Dealer Selling Agreement.[7]

The termination decision was appealed to an umpire pursuant to the provisions of the General Motors Dealer Relations Umpire Plan. After a full hearing, the umpire affirmed the decision of Chevrolet Division. As there had been stays pending hearing before the umpire, actual termination did not occur until December 28, 1961.

In essence, the first counterclaim charges coercion and intimidation during the Santa Fe meeting. The defendant maintains that McMullen had been given to understand that General Motors and

---

7. Pertinent provisions of the letter of termination are as follows:

"This will advise you that after a thorough analysis here in Detroit of all pertinent facts pertaining to our dealership relationship with MAC Chevrolet Company, we have concluded that Chevrolet Motor Division has no choice but to notify you and it hereby does notify you that your current Chevrolet Dealer Selling Agreement is terminated by it pursuant to the provisions of Section 18, subsection 3, paragraph (4), subparagraphs (c) and (d).

"The recent change in the active management of MAC Chevrolet was made without the prior written approval of Chevrolet, in violation of Paragraph THIRD of MAC Chevrolet's current Chevrolet Dealer Selling Agreement. Why or how the change was effected is not an issue so far as Chevrolet is concerned * * *

"A second condition exists at MAC Chevrolet, that is, the controversy between its stockholders, which very evidently adversely affects the business of both the dealership and of Chevrolet * * *

"We firmly believe that in fulfilling both our immediate and long-range responsibilities to Chevrolet owners and customers and in protecting Chevrolet's legitimate interests in the important Espanola market, Chevrolet must now sever its dealership relationships with MAC Chevrolet * * * *"

Chevrolet Central Office representatives would have authority to settle the dispute at the meeting, whereas they disclaimed having such authority. *Secondly,* defendant complains that General Motors objected to having a court reporter in the meeting. *Thirdly,* he alleges there were shouts, threats and other intimidating acts by General Motors representatives during the meeting.

The evidence discloses that toward the end of the meeting McMullen presented a proposal for ending the dispute with Cimino. The proposal required Chevrolet Division's acceptance of McMullen as sole proprietor of the Espanola dealership. He proposed to either manage the outlet or have someone of his choice do so. Whether General Motors was apprised of the nature and extent of the dispute when it agreed to have an authorized representative present is not apparent, and does not in any event appear material to the issue of coercion.

We find no coercion or intimidation in the refusal to accept this proposed settlement in view of the fact that it was a drastic change from that which had been initially agreed upon. Nor do we see any merit in the refusal of General Motors to have a court reporter present at the meeting. After all, this was not a court case—it was a discussion of contract problems. Furthermore, the allegation that tempers flared and that there were shows of anger at the conference table do not establish coercion.

There are additional allegations of coercion in connection with the relationship between MAC Company and Chevrolet Division, but these appear to be trivial. They have to do with sending of parts bills to the wrong outlet and other similar complaints. There are also undertones that Cimino and Chevrolet Division were conspiring secretly against McMullen. However, there is no evidence to support this.

The contract in question was for a five-year period. General Motors did not, as has been indicated, initiate the events culminating in termination. It in fact met with the quarreling participants and sought to resolve the controversy. Furthermore, the matter was reviewed by a neutral arbiter who found McMullen's position to be without merit. We are struck by the fact that General Motors was faced with a dilemma in dealing with these two warring partners. General Motors did not start the fight but was the mediator.

Unless we are to conclude that a manufacturer can not terminate a dealership on the basis of substantial violations of its terms, it is clear that the first counterclaim is wholly without merit. There are no genuine issues of fact outstanding capable of making this a lawsuit. A trial would be expensive and in final analysis futile.

From a careful reading of all of the evidence in the extensive record before us there are no reasonable doubts concerning any genuine issues of material fact. Therefore, the motion for summary judgment as to counterclaim One is appropriate, and for the reasons stated above should be granted.

## II.

Counterclaim Two involves the McMullen Company of Alamosa, Colorado, defendant's assignor.

On July 6, 1961, Chevrolet Division by letter informed McMullen that it did not intend to renew the McMullen Company's Chevrolet franchise. The relationship between McMullen Company and Chevrolet Division had existed for many years and there had been franchise agreements since January, 1948. The final one was executed on November 1, 1960, for one year—although McMullen was offered a five-year franchise at that time, he elected to enter a one-year contract.[8]

---

8. The contract between the McMullen Company and Chevrolet Division provided in part:

"FOURTH: This Agreement shall continue in force and shall govern all re- lations between the parties for a term * * * expiring October 31, 1961. At the end of the stipulated term, this Agreement shall automatically terminate without notice or action on the part of either

The reasons given by General Motors for refusal to renew had to do with alleged poor sales performance of the McMullen Company during the years 1955–1960.[9] There is no dispute about the sales record being poor. However, McMullen maintains that the poor sales record was attributable to unlawful acts of General Motors and that consequently the refusal to renew was invalid.

[7] Thus, it is necessary to analyze the facts as they have been developed in the course of the discovery. Noteworthy is the fact that some of the alleged coer-

party unless sooner terminated as hereinafter provided in Section 18."

Paragraph 9 of the Agreement Booklet provided:

"9. *Sale of Motor Vehicles*

Dealer shall provide satisfactory sales performance and render satisfactory service to owners in the area * * * Evaluation of Dealer's sales performance shall be based on the relationship of Dealer's sales of new Chevrolet motor vehicles in such area to the sale of other makes of motor vehicles directly competitive therewith both in price and in product in such area, as compared to a similar relationship of the sales of new Chevrolet motor vehicles to other makes of motor vehicles directly competitive therewith specifically in the Chevrolet Zone area wherein dealer is located, but not necessarily to the exclusion of the Chevrolet Regional area or the National area. Such evaluation shall be based on records generally accepted for such purposes by the automobile industry and shall also take into account other pertinent factors, * * *"

9. The letter of non-renewal contained the following language:

"Under date of May 3, 1961, Mr. K. E. Staley, General Sales Manager for Chevrolet, wrote to you * * * Mr. Staley reminded you that at a meeting you had with him, Mr. Mays, Mr. Gilliatt and the writer in Detroit on March 20, 1961, he had pointed out to you that the sales performance of your dealership in recent years has been most unsatisfactory and substantially below the sales obligation which you assumed under the Chevrolet Dealer Selling Agreement. Mr. Staley at that time had also indicated that Chevrolet might be left with no alternative but to inform you that your company would not be offered a new Selling Agreement upon the expiration of your current Chevrolet Dealer Selling Agreement * * *

"After having given due weight to all pertinent factors, including consideration of the type of representation Chevrolet might expect from The McMullen Company in the future and the nature of the relationship which might be in prospect based on past experience, I have been authorized to notify you * * * that

Chevrolet * * * will not offer the McMullen Company a new Chevrolet Dealer Selling Agreement when its current Chevrolet Dealer Selling Agreement expires on October 31, 1961 * * *

"Since 1956 the sales performance of your dealership has consistently been substandard and unsatisfactory when measured by the criteria set forth in the Selling Agreements under which you have operated * * *

"The figures * * * show that the percentage of sales in the Alamosa area, based on registrations, as against zone average, was accounted for in large part by sales made by others in your area * * * this situation * * * indicates that you are either unwilling or unable * * * to obtain for Chevrolet its proper share of the market * * * The unwillingness or inability on your part, we believe, is a principal contributing factor to your unsatisfactory profits. Very obviously both your unsatisfactory sales performance and your recent unprofitable operations should discourage the continuance of such a mutually unsatisfactory dealership operation * * *

"Perhaps the real basis for your attitude lies in the fact that somehow or other you have assumed from an alleged conversation you had with a Chevrolet representative in 1940 that your company should be the sole Chevrolet dealer in the San Luis Valley * * *

"In effect, you who are the owner and operator of a dealership in Alamosa which has provided Chevrolet with unsatisfactory sales performance for many years, were asking Chevrolet [at the March 20 meeting] to eliminate by one means or another 4 other Chevrolet dealerships in the San Luis Valley * * * It is small wonder that Mr. Staley and other Chevrolet representatives to whom you advanced your proposal refused to give it any consideration whatsoever * * *

"The facts pertaining to your dealership operations and the unsatisfactory relationships with Chevrolet which you have generated leave us with no choice but to give you the notice of non-renewal of your current Chevrolet Dealer Selling Agreement provided by this letter."

cion occurred prior to 1955 and thus has limited probative value. Zarbock v. Chrysler Corporation, D.C.Colo., 1964, 235 F.Supp. 130.

McMullen points to three meetings with General Motors representatives as showing coercion. On the first such occasion, December 15, 1960, the Chevrolet Division Zone Manager called on McMullen and told him that he had poor public and employer relations and should resign as a dealer. The alleged intimidation consisted of the zone manager's refusing to discuss the percentage of cars allocated to the McMullen Company from total Chevrolet production. Next, at a meeting January 19, 1961, in Alamosa, two Chevrolet Division representatives talked to McMullen about his poor sales record and he reminded them of an old promise given back in 1940 that he could gain control of the San Luis Valley market through his dealership in Alamosa. The refusal of the representatives to discuss this promise is complained of.

Finally, on March 15, 1961, a meeting was held in the Detroit office of Chevrolet Division's General Sales Manager, K. E. Staley. McMullen claims that at this meeting he was subjected to constant pressure, coercion and intimidation; was asked by Mr. Staley: "When did you stop being a good Chevrolet dealer?"; and was invited to sue Chevrolet.

Undoubtedly, the McMullen Company's poor sales record was discussed at each meeting. However, giving McMullen's allegations full weight, it can not be concluded that the meetings individually or in totality constituted unfair bargaining within the meaning of the act as described above. There was a long background of unsatisfactory performance and unhappy relationship. It can not be concluded that spirited conversations at these meetings had any effect upon the poor sales record existing over a period of years.

The defendant points to other factors which allegedly produced McMullen Company's poor performance and led to the refusal to renew. First, McMullen maintains that although in 1940 he was promised a priority in the geographic area, his efforts to build up sales by purchasing other dealers in the area were thwarted. Second, he states that in 1953 a sales representative told him that in order to obtain the number of automobiles he desired he must also order several trucks he did not want. This item is irrelevant and remote. Third, he claims that in 1955 he was told that he should take a profit as low as Ten Dollars per car in order to improve his sales. This is also remote and only serves to establish that pressure was put on McMullen to improve his sales. Fourth, McMullen claims that in 1959 a General Motors Parts Representative sought to sell him unwanted parts in connection with a contest. This may have been unfair dealing, but no causal relationship is established between this act and the refusal to renew.

Viewing the evidence in the light most favorable to the defendant, it may be concluded that there are disputes of fact; however, resolving all such disputes in favor of the defendant, it still must be concluded that the requisite bad faith and coercion leading to refusal to renew can not be demonstrated. Obviously, it is not sufficient to show that there are differences in the testimony. The disputes of fact must be of such a character that they affect the claim on the merits. When all the facts are considered in their total effect, and all doubts resolved in defendant's favor, and it still must be said that no violation of the act is shown, the case is a proper one for the entry of summary judgment. For the reasons stated above, plaintiff's motion for summary judgment on counterclaim Two must be granted.

### III.

Considering the third counterclaim, we turn to the Buick franchise of the McMullen Company. The first contract was entered into in 1953; the last was signed on November 1, 1961, for a period of five years. It is still in effect. Thus, the claim is not for wrongful termination or non-renewal; instead, defendant alleges that from the beginning General Motors has refused to deliver sufficient Buick

automobiles to meet McMullen Company's needs, has arbitrarily and capriciously delayed delivery of Buick automobiles, and at various times has employed intimidation and coercion against the McMullen Company.

 Regarding delay, McMullen pinpoints nine specific instances of late delivery ranging from seven weeks to nine months. But from an examination of his contentions it is not apparent that there were any wilful or arbitrary delays; in other words, he does not show that the delays were anything other than normal operational hazards in the industry during the initial months of new model years. It would appear that all dealers have this same problem. The complaints may constitute grounds for some type of legal action, but they can not be said to constitute coercion, intimidation, or threats thereof constituting unfair bargaining within the meaning of the act.

On its face the third counterclaim offers less merit than the others since it depends for its existence on facts which have less legal significance in and of themselves than those which appear in counterclaims One and Two. Here there is neither termination nor failure of renewal. The act in question does not create additional causes of action for *breach of contract,* but is limited to claims of unfair dealing as specifically defined therein. Globe Motors, Inc. v. Studebaker-Packard Corp., 3 Cir., 1964, 328 F.2d 645. Inefficiency, however vexatious or even detrimental to a dealer, does not give rise to a cause of action unless wilful misconduct is also shown. Inferences of such wilful misconduct do not readily arise from allegations such as those appearing in defendant's third counterclaim.

\*　　\*　　\*　　\*　　\*　　\*

In summary then, we have reviewed the record in the light of the legal standards set forth in the Automobile Dealers Franchise Act and decisions construing it. We find the evidence which has been brought to light legally insufficient to satisfy the standards and nonproductive of justiciable questions of fact and law. Because of this we are constrained to conclude that all three counterclaims are without merit and that the same must be dismissed. It is, accordingly

Ordered, that the motions of General Motors for summary judgment on the three counterclaims be, and the same are hereby, granted. The Clerk is directed to enter judgment for the plaintiff on this phase of the case.