**LEO SPEAR CONSTRUCTION COMPANY, Inc., Plaintiff-Appellee,**

v.

**The FIDELITY AND CASUALTY COMPANY OF NEW YORK and Brookfield-Baylor, a Joint Venture, Defendants-Appellants.**

**No. 704, Docket 35696.**

United States Court of Appeals, Second Circuit.

Argued March 19, 1971.

Decided July 1, 1971.

Before MOORE and SMITH, Circuit Judges, and TIMBERS,* District Judge.

MOORE, Circuit Judge:

This is an appeal from a judgment awarding plaintiff damages under a quantum meruit theory of recovery in the amount of $90,845 plus interest of $5,910.99 and in addition $50,000 damages under a theory involving tortious interference with business relations.

On June 20, 1967, Leo Spear Construction Company (Spear), plaintiff herein, entered into a contract with F. H. McGraw and Company, Inc. (McGraw), the prime contractor in the construction of new student housing at the University of Vermont at Montpelier (the University), wherein Spear as a subcontractor agreed to perform certain work in connection with that construction job for a contract price of $618,000.

In December, 1968, McGraw defaulted in the performance of the prime contract and on December 19, the University chose to terminate McGraw's contract effective December 29, 1968. The defendant Fidelity and Casualty Company (F & C) was McGraw's surety and had issued both payment and performance bonds to the University which bonds were drawn on a form of the Department of Housing and Urban Development. Under the terms of this bond, it was to be void if the contractor, McGraw, made prompt payment to the subcontractors and materialmen.

At the time of McGraw's default, Spear was faithfully performing its obligations under its subcontract. However, its activities had been thwarted in a number of ways by McGraw. These included McGraw's failure to provide sufficient winter heat, delays from changes in the pier footing, compaction problems and, as a result of dynamiting operations by McGraw, the cracking of various walls and other concrete structures installed by Spear. Besides necessary corrective work, however, Spear had placed 152,000

Jack Hart, New York City (Hart & Hume, New York City, of counsel), for defendants-appellants.

Philip A. Kolvoord, Essex Junction, Vt. (Kolvoord & Overton, Essex Junction, Vt., of counsel), for plaintiff-appellee.

* Chief Judge, District of Connecticut, sitting by designation.

out of 164,000 bricks which had to be placed in the project or 92.1%, and he had placed 161,000 out of 163,000 cement blocks or 98.77%.

On December 9, 1968, Spear and one of its suppliers notified the defendant F & C that they were filing a mechanic's and materialman's lien respectively. Two days later, Spear again wrote F & C, indicating that it stood ready to co-operate with F & C in completing the project, and asking F & C to outline its position regarding the entire situation.

On January 2, 1969, the University notified F & C to complete the project pursuant to its performance bond. Thereafter, F & C contracted with Brookfield-Baylor (Brookfield) which was to accomplish this completion. Brookfield was, of course, under no duty to contract with Spear to complete the work covered by Spear's subcontract, and both defendants seem to have been having doubts about allowing Spear to finish the job because of its questionable financial status. F & C had become aware of Spear's financial problems as early as December 12, 1968 when it had learned of an all-monies assignment of funds due Spear under the McGraw con-tract to the Chittenden Trust Company of Burlington, Vermont. Thus on Feb-ruary 5, Phil Scaglione of F & C in-formed plaintiff that the contract would not be renewed. However, on February 13, Spear's president, Leo Spear, was told at a conference in New York City that Spear would be allowed to finish the con-tract and receive its unpaid balance if it could furnish an acceptable bond.

A letter of February 28 confirmed the February 13 arrangement but demanded action within ten days. Difficulties then arose over the terms of the bond. The Aetna Insurance Company agreed to write a bond for Spear on condition that F & C rather than Brookfield-Baylor be the only obligee, a condition which F & C stated "may be acceptable" in the Feb-ruary 28 letter, and also on condition that F & C rather than Brookfield be the contractor. F & C insisted that while the bond could be written to it, the con-tract must be with Brookfield. F & C points to various legal problems it might have faced had it assumed the role of contractor. Several days later plaintiff was informed that it would not be hired to complete the work it had started.

On April 2, 1969, after being informed that the subcontract would not be main-tained in effect by F & C and Brookfield, Spear's men came onto the site and drove off with a truckload of structural tile. Then they returned and started to load a second truck. However, Brookfield ob-tained a writ of attachment from the Chittenden District Court in Burlington, Vermont and caused the sheriff to seize and chain the truck. Before this action by the sheriff, Brookfield detained Spear's truck by parking another vehicle in front of the truck and dumping a load of sand in front of it. However, the de-fendants at no time caused the writ to be entered since the Chittenden District Court found the injunctive remedy to be inappropriate and defendants decided to assert their claim for conversion as a counter-claim in this action. After the determination by the Chittenden Court that no injunction should issue, Spear's representatives went onto the job site only to find that much of the material which had been in the truck had been removed, notwithstanding that the truck and its contents were still under the control of the sheriff pursuant to the writ. Spear also complains that Brook-field used various equipment belonging to Spear in the course of its work, and that in addition to Spear's rights were violated when F & C took these actions since such actions violated an agreement of April 2 to preserve the status quo be-tween Spear and Brookfield-Baylor. Brookfield suggests that this agreement, stated to terminate when the controversy was settled, in fact terminated when the Chittenden suit was terminated.

Spear had seven unpaid suppliers on this job, their total claims amounting to $52,173. After commencement of this

suit in April, 1969, payment was made by F & C to these suppliers on July 2, 1969. Plaintiff suggests that this payment was unreasonably delayed in that F & C at no time disputed its liability to these materialmen and paid them as per their bills. However, there was some dispute over whether these payments would be made to the materialmen directly or through Spear, since Spear apparently was seeking leverage in an attempt to obtain credit from its materialmen. After these payments were made to the materialmen by joint checks written to the materialmen and Spear, some of the suppliers agreed to loan a percentage of these payments to Spear.

## I.

### Quantum Meruit Recovery

█ Plaintiff, by an amended complaint, claimed damages under the payment bond on a quantum meruit basis, rather than on the contract. The plaintiff was entitled under Vermont law [1] to make this election under the facts and circumstances of this case. Peist v. Richmond, 97 Vt. 97, 122 A. 420 (1923).

██ Thus, plaintiff was entitled to recover in this suit the fair and reasonable value to the defendant F & C of the work performed and the materials furnished. Gilman v. Hall, 11 Vt. 510 (1839); Silos v. Prindle and Prindle, 127 Vt. 91, 237 A.2d 694 (1968). The District Court carefully examined the various items of damage and proof thereof, viewed the construction site in order to make a more accurate judgment as to the proper amount of damages, and concluded that the fair and reasonable value of the work and material supplied by plaintiff was $674,866.92.

This figure was arrived at as follows:

| | | |
|---|---:|---:|
| direct labor charges incurred by plaintiff | $377,393.49 | |
| less amount estimated by district court attributable to increased costs due to McGraw's default on his contractual obligations and amounts attributable to correctional work | 27,393.49 | |
| direct labor charges benefiting defendant F & C | | $350,000.00 |
| amounts spent by plaintiff for material for the benefit of defendant | | 222,327.28 |
| 20% addition to labor costs for taxes, insurance, Social Security, pension, health and welfare funds | | 70,000.00 |
| 6% of total for overhead and profit | | 38,539.64 |
| subtotal | $680,866.92 | |
| less correctional work to be done | 6,000.00 | |
| fair value of labor and material furnished | | $674,866.92 |

This figure was then reduced by $300, representing the value of the material removed from the site by the plaintiff for which the defendant F & C paid the materialmen on July 2, 1969 and by $583,721.92, amounts paid to Spear by McGraw under the contract. This resulted in a net amount due plaintiff of $90,845 plus interest of $5,910.99 for a total of $96,755.99. We believe this computation was supported by the evidence, was not clearly erroneous, and represented a proper application of the legal principles involved.

Defendants suggest that plaintiff failed to establish a case in quantum meruit because there was no testimony as to the fair and reasonable value of the labor and materials furnished, although Spear

1. In this diversity action brought in the State of Vermont, the law of that State governs our decision herein. Erie Ry. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The defendant F & C suggests that because this bond was drawn on a H.U.D. form, it should be subject to federal law applicable to suits under the Miller Act, since these bonds are "in substance" like Miller Act bonds. While in construing such bonds in accordance with Vermont law, it may be useful to refer to Miller Act cases from other jurisdictions because of the similarity of the forms, we note that even Miller Act cases are decided pursuant to state, rather than federal law. Continental Casualty Company v. Schaefer, 173 F.2d 5 (9th Cir.), cert. denied, 337 U.S. 940, 69 S.Ct. 1517, 93 L.Ed. 1745 (1949).

testified as to his direct costs, and because there was no indication as to what extent these costs were increased by Spear's own defective workmanship and corresponding need for corrective work and by McGraw's default on his contractual obligations.

■ Leo Spear testified as to his opinion of the "total value" of the work performed, giving the figure of $713,-711.44 and justifying it as a cost-plus estimate, supplying the figures for direct costs of materials and labor, together with the 6% figure for overhead and profit. This testimony, together with the Court's examination of the site, provided a sufficient basis for the Court's conclusions with respect to the fair market value of such labor and materials before any set-off. In allowing the inspection of the site to influence its determination of value, the Court acted properly, since in no respect did it ignore the other evidence of value, in this case being only the testimony of Leo Spear. Cf. Eisenlohr v. Kalodner, 145 F.2d 316, 318 (3d Cir. 1944), cert. denied, 325 U.S. 867, 65 S.Ct. 1404, 89 L.Ed. 1986 (1945); In re City of New York, 1 N.Y.2d 428, 154 N.Y.S.2d 1, 136 N.E.2d 478 (1956).

■ As to these items of set-off, Leo Spear candidly presented the only evidence of their existence. He admitted that added expense has been incurred by McGraw's failure to properly coordinate the activities of subcontractors, by its failure to provide heat in the winter, by inadequate compaction and by dynamiting damages caused by McGraw. Spear also admitted that certain corrective work was necessary because of his own fault and gave an estimate of the cost of doing the corrective work yet to be finished. F & C suggests that because Spear did not attach a dollar value to each of these items, and presented no proof thereon, the total damages cannot be ascertained. However, based on Spear's testimony, the District Court was entitled to make a fair determination of the value which should be attributable to these factors, and the Court did this, reducing the direct labor item of damages to $350,000 to reflect increased labor costs due to these factors and subtracting from the total value of labor and material supplied by plaintiff, $6,000 to cover costs of correctional work still to be done.[2]

■ We conclude that while the evidence did not lend itself to any exact determination of the damages involved, the verdict as rendered was a fair estimate based on the testimony and other evidence and as such we uphold the District Court's determination of damages on the quantum meruit ground of recovery.

## II.

*Interference With Business Relations*

On the other hand, we believe that no relief whatever is appropriate against either defendant on the "interference with business relations" theory of recovery. In Pierce Ford Sales v. Ford Motor Company, 299 F.2d 425 (2d Cir.), cert. denied, 371 U.S. 829, 83 S.Ct. 24, 9 L.Ed. 2d 66 (1962), this Court rejected such an attempt by a Vermont automobile dealer who sought damages under this interference-with-business-expectancies theory based on Ford's refusal to allow the plaintiff there to sell its dealership to a third party at a price Ford regarded as

2. Defendants contend in effect that in the absence of a Vermont case it is reasonable to conclude that Vermont would adopt as a proper interpretation of bonds of this sort the theory that they exclude damages "outside the contract" (damages caused by the defaulting contractor's acts or omissions other than failure to render payments due subcontractors). *See* L. P. Friestedt Co. v. U. S. Fireproofing Co., 125 F.2d 1010 (10th Cir. 1942); Arthur N. Olive Co. v. United States, 297 F.2d 70 (1st Cir. 1961). However, whether or not this be so, we believe that no damages "outside the contract" were included in the award herein since the *quantum meruit* recovery was reduced as described in the text. This fact is not changed simply because this reduction was made on the independent basis that such items did not benefit the defendant and therefore were not properly included under a *quantum meruit* theory.

excessive thereby reversing the determination of the District Court.

Section 766 of the Restatement of Torts (1939) provides in part:

" * * * one who, without a privilege to do so, induces or purposely causes a third person not to (b) enter into or continue a business relation with another is liable to the other for the harm thereby caused."

■ In *Pierce,* this Court held § 766 inapplicable because it found that Ford had a privilege to take steps to protect the financial soundness of its dealers and therefore was justified in refusing to accept a new dealer who was being forced to purchase at an excessive price. In this case, we think that F & C was privileged to withhold payment to Spear's suppliers pending determination as to Spear's status and resolution of the controversy as to who was entitled to possession of the material Spear had left on the construction site. The evidence shows that Spear, because of its financial plight, apparently sought ways to induce its suppliers to extend credit to it by accepting less than full payment from F & C and allowing Spear to have the remainder. As such it resisted attempts by F & C to deal directly with these suppliers. In so doing, Spear contributed at least as much as did F & C to the delay in paying the materialmen.

Recovery under § 766(b) based on the delay in paying subcontractors is also inappropriate because there is no proof that F & C acted for the purpose of preventing Spear from dealing with third parties. F & C had no interest in so doing but it did have an interest in effecting payment to the materialmen in such a way as to foreclose any future claims of liability against it by the materialmen and by Spear for the material involved. This was complicated by the fact that some of this material for which payment to the materialmen was delayed was removed by Spear from the construction site. Indeed, it might well be inferred that F & C's conduct in delaying payment was merely to induce Spear to return the material which Spear had removed from the site to "protect ourselves" (A. 168) which presumably was to deter defendants from engaging another subcontractor to finish Spear's part of the job. It is clear then with respect to the delay in payment that F & C acted to protect its legitimate interests and not for the purpose of injuring Spear's relations with third parties.

■ In addition to the "unreasonable delay," the District Court cited two other factors said to constitute interference with business relations. They were: (1) not permitting plaintiff to complete the subcontract, and (2) improperly attaching plaintiff's truck which contained materials Spear sought to remove from the construction site. As to the first factor, defendants were under no duty whatever to continue Spear on the job which it began with McGraw. As to bad faith negotiations, Spear suggests F & C strung him along in order to appease the University which was friendly to Spear. However, the facts indicate that F & C made clear its doubts about the wisdom of continuing Spear on the job from early February, and the only possible basis for an inference of bad faith came in March when it refused to modify its conditions for a bond from Aetna, and may have withheld its final decision not to hire Spear for a few days after such decision was made. Delay for this short period was *de minimis* and in any event justifiable as an attempt by defendants to guarantee themselves a financially stable subcontractor. Similarly, as to the alleged improper attachment of the plaintiff's truck, and expropriation of materials contained therein, whether or not this was improper or in violation of any agreement between Spear and defendants, there was no showing that this rather trivial incident in any way prevented Spear from dealing with anyone else. Further, the fundamental question of who as between Spear and defendants were properly entitled to possession of the material in question was open to

doubt,[3] and plaintiff and defendants each clearly acted not in order to prevent the other from dealing with third persons but in order to safeguard its own rights to such materials. Thus, the only remedy for either party was an action in conversion.

Furthermore, the third parties with whom plaintiff was prevented from dealing are difficult to ascertain. While the theory of the District Court points to unnamed persons who would have engaged Spear to do work but for the defendants' activities, normally § 766 contemplates third parties whose identities are much less vague and speculative.

The proof is virtually undisputed. Upon the record as a whole in our opinion, the standards for the imposition of damages for tortious interference have not been met.

In view of the fact that we have found the acts of defendants not to constitute the tort of interference with business relations, it is unnecessary for us to consider the question of the proper allocation of responsibility between the two defendants for the acts alleged.

The judgment against F & C in the amount of $90,845 plus $5,910.99 interest is affirmed; that portion of the judgment against F & C and Brookfield-Baylor for $50,000 is reversed.

Judgment, therefore, should be entered in favor of Spear in the amount of $90,-845 plus interest of $5,910.99. Costs to the appellee.

TIMBERS, District Judge (concurring in part and dissenting in part):

I concur in the judgment of the Court and the able opinion of Judge Moore to the extent that it affirms the judgment of the District Court awarding plaintiff $90,845, plus $5,910.99 interest, on its *quantum meruit* recovery against Fidelity and Casualty.

With deference, however, I am constrained to dissent from the reversal of the District Court's $50,000 judgment against Fidelity and Casualty and Brookfield-Baylor for tortious interference with plaintiff's business relations. My dissent is based on the belief that the majority has failed to credit the findings of the District Court on this issue with the weight to which they are entitled under Rule 52(a), Fed.R.Civ.P.

The majority has correctly set forth the widely accepted legal standard for imposing liability based on tortious interference with business relations—in short, action without privilege which causes a third person to refuse to enter into or continue business relations with another, resulting in harm to the latter.

3. The subcontract between McGraw and Spear provided that it was subject to the conditions of the general contract which in turn provides (§ 25(c)):

"All material and work covered by partial payments made shall thereupon become the sole property of the Owner, but this provision shall not be construed as relieving the Contractor from the sole responsibility for the care and protection of the materials * * *."

In accordance with 9A V.S.A. § 2–401, title to the goods passed to defendants as McGraw's assigns in accordance with the contract between McGraw and Spear. Yet possibly under 9A V.S.A. § 2–702 (1), Spear had the right to withhold delivery except for cash upon McGraw's apparent insolvency, depending on whether Spear's storage of these goods on the construction site constituted a delivery to McGraw. Even if it had been a delivery to McGraw, Spear might have been justified in removing the goods in order to fulfill his responsibility for "the care and protection of the materials * * *." It is unnecessary for us to resolve this question of who was entitled to possession in order to demonstrate that neither party necessarily acted in bad faith in claiming such right.

As to the agreement between Spear and F & C relating to these materials, it was ambiguous as to when it would expire, and may reasonably have been interpreted by F & C to have expired upon the refusal of the Chittenden Court to grant an injunction, although perhaps the more likely interpretation was that the material would not be touched until that Court had determined the right to title on the merits.

Restatement of Torts § 766 (1939). See also 1 Harper & James, The Law Of Torts § 6.11 (1956); 45 Am.Jur.2d *Interference* § 3 (1969).

Judge Oakes' Findings of Fact Nos. 27–45 squarely support his conclusions that "defendant F & C's interference was tortious, being willful and in bad faith" and "[d]efendant Brookfield-Baylor was a knowing participant in such interference although acting under defendant F & C's direction and control and is liable as is any other agent for tortious conduct even though acting for a principal." Since, in my view, Judge Oakes' findings on this issue are based on substantial evidence adduced at an eleven day trial before the late Judge Gibson and Judge Oakes,[1] they are not clearly erroneous and should not be set aside.

In short, Judge Oakes found, and the evidence shows, that F & C and Brookfield-Baylor (a subsidiary of F & C) caused at least three separate third parties or groups to refuse to enter into or continue business relations with Spear: (1) suppliers and materialmen of Spear; (2) Spear's sources of credit, such as banks; and (3) Spear's bonding company. Moreover, Judge Oakes found, and the evidence shows, that the tortious conduct which directly caused substantial financial harm to Spear consisted of (1) unreasonable delay by defendant F & C in making payment to Spear and Spear's suppliers; (2) not permitting Spear to complete the subcontract and negotiating in bad faith in connection therewith; and (3) improperly instituting attachment proceedings and taking into possession Spear's truck and causing its materials and equipment to be used.

While no useful purpose would be served by detailing the substantial evidence which I find supports these findings, brief reference to the undisputed evidence supporting the finding of unreasonable delay on the part of F & C in making payment to Spear and Spear's suppliers will suffice to illustrate the point. Under the terms of its payment bond, F & C was obligated to "promptly make payment to . . . subcontractors . . . furnishing materials for or performing labor in the prosecution of the work provided for in such contract." On December 20, 1968, Spear made formal demand upon F & C for payment to Spear and Spear's materialmen under the bond. Not until July 4, 1969—more than six months later—did F & C pay $51,492 to Spear and its suppliers and $681 to other creditors of Spear. In the meantime, F & C admitted in a letter written on May 28, 1969 that "we've offered what we consider a reasonable settlement—payment of his bills (*which we owe under the bond anyhow*) and some cash." (Emphasis added.) On the basis of this evidence, Judge Oakes found that "Delay in payment by defendant F & C was unreasonably long. Such delay was intentional, vexatious and in bad faith on the part of defendant F & C."[2]

1. Judge Gibson died after nine days of trial and before deciding the case. The parties stipulated that Judge Oakes could decide the case upon the record made before Judge Gibson and upon such additional evidence as he wished to receive. Judge Oakes took additional evidence on two further days. He also viewed the construction premises in the presence of counsel.

2. The case of Pierce Ford Sales, Inc. v. Ford Motor Co., 299 F.2d 425 (2 Cir.), cert. denied 371 U.S. 829 (1962), relied on by the majority, strikes me as being distinguishable in at least this critical respect: there the perpetrator of the tort, Ford Motor Co., clearly was privileged to refuse to accept certain franchises; here F & C was under a contractual duty *promptly* to pay all subcontors, suppliers and materialmen and it was not privileged to delay doing so. In *Pierce* a letter had been written by the injured party, Pierce, to the Ford Motor Co., stating that "because of your (Ford's) legitimate concern with the character, ability and finances of dealers in your products, you have the right to decline, in your discretion, to enter a Sales Agreement with any person who may be willing to agree to purchase our assets." 299 F.2d at 427. In the instant case, payment under the terms of the bond was not discretionary with the surety, nor was the time of payment.

Similarly, there was substantial evidence that F & C's delay in paying Spear under the bond had injured Spear's credit rating with lending institutions—a matter of consequence to a small company with limited financial resources; that Spear's relations with suppliers and materialmen likewise had been damaged by such delay; and that F & C's intransigence in insisting that Spear's bonding company, Aetna, in writing a bond to secure Spear's completion of the job, must make Brookfield-Baylor the obligee (Brookfield-Baylor being in shaky financial condition because of its $2,000,000 indebtedness to F & C) resulted in a loss of Spear's bonding capacity with Aetna, i. e. a temporary reduction from $2,000,000 to zero, and a subsequent restoration to $1,200,000.

All in all, I find Judge Oakes' findings of fact to be clear, comprehensive and precise. In each instance they are buttressed by the evidence. As such, they are not clearly erroneous and should not be set aside. We should not substitute our findings as to the facts, or as to the inferences to be drawn from the facts, for those of the trial judge.[3] United States v. 396 Corp., 264 F.2d 704, 709 (2 Cir. 1959) (Gibson, J.); Watson v. Joshua Hendy Corp., 245 F.2d 463, 464 (2 Cir. 1957); Ferguson v. Post, 243 F.2d 144, 145 (2 Cir. 1957); Purer & Company v. Aktiebolaget Addo, 410 F.2d 871, 878 (9 Cir.), cert. denied, 396 U.S. 834 (1969). Cf. Dunlop v. Warmack-Fitts Steel Co., 370 F.2d 876, 879 (8 Cir. 1967).[4]

I would affirm the judgment of the District Court in all respects, including its award of $50,000 for tortious interference with business relations.

3. Put another way and with commendable succinctness (but allowing for license in paraphrasing), "when two skilled trial judges . . . have passed upon the facts, it should not be the function of an appellate court, as a nonparticipant in the events . . . . , to overrule the factual determinations of those charged with this responsibility." United States v. Manning, 448 F.2d 992, 997 (2 Cir. 1971), (dissenting opinion).

4. What happened in the instant case is both obvious and unfortunate. Appellants, in their brief and in oral argument, totally disregarded the careful findings of fact made by the District Court on the tortious interference issue and their support in the factual record. Instead, appellants engaged in their own selection of facts and inferences, just as though the issues of fact were to be tried *de novo* in this Court. This is precisely the course of conduct that Rule 52(a) was designed to prohibit. It is for this reason that I most emphatically would reject appellants' disregard of this salutary Rule and would back to the hilt Judge Oakes' faithful conformity to the Rule.