SALCO CORPORATION, formerly known and doing business as Denver Buick, Inc., Plaintiff-Appellant,

v.

GENERAL MOTORS CORPORATION, BUICK MOTOR DIVISION, Defendant-Appellee.

No. 73–1842.

United States Court of Appeals, Tenth Circuit.

Submitted July 9, 1974.

Decided May 14, 1975.

James C. Bull, Denver, Colo. (Quiat, Bucholtz & Bull, P. C., Denver, Colo., of counsel), for plaintiff-appellant.

Arthur E. Otten, Jr., Denver, Colo. (Davis, Graham & Stubbs, Richard W. Daily, Denver, Colo., Thomas W. Watkins, Julius L. Russu, Detroit, Mich., Ross L. Malone, New York City, of counsel), for defendant-appellee.

Before MOORE*, HILL and DOYLE, Circuit Judges.

MOORE, Circuit Judge:

This appeal arises from an action instituted by Salco Corporation, formerly doing business as Denver Buick, Inc.[1] (hereinafter referred to as "Denver Buick") against General Motors Corporation, Buick Motor Division (hereinafter referred to as "General Motors"). In its complaint Denver Buick alleged in substance that General Motors had forced it

to terminate its dealership franchise agreement by failing to act in "good faith", as required by the Automobile Dealer Franchise Act (ADFA), 15 U.S.C. §§ 1221–25 (1970).[2] Denver Buick also alleged violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 (1970). The antitrust claims involved, respectively, the location clause in the franchise agreement between the parties and an alleged conspiracy to monopolize the Denver market in the sale of Buick and Opel automobiles. Other claims asserted in the complaint were dismissed and are not involved in this appeal.

Without written opinion, the district court granted a defense motion to dismiss Denver Buick's Sherman Antitrust Act claims for failure to state a claim upon which relief can be granted. After extensive depositions of key witnesses for both parties had been taken, lengthy affidavits and memoranda of law submitted, voluminous exhibits marked and a pre-trial conference held, a motion for summary judgment was made by General Motors. The court below granted General Motors' motion for summary judgment on Denver Buick's ADFA claim for damages (the First claim for relief in the complaint). Denver Buick appeals from the final judgment of dismissal.

Appellant Denver Buick had been a Buick franchise new car dealer for 47 years in the Denver metropolitan area. For many years it had operated its Buick dealership at 700 Broadway in Denver.

---

* Honorable Leonard P. Moore, Senior Judge, United States Court of Appeals, Second Circuit, New York, N. Y., sitting by designation.

1. Lou Cohan (father) and Harold Cohan (son) were the Vice President and President, respectively, of Denver Buick and together with Lou's wife were the principal stockholders.

2. 15 U.S.C. § 1222 permits an automobile dealer to bring suit against a manufacturer to recover damages stemming from the "failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise,

or in terminating, canceling, or not renewing the franchise with said dealer . . .." Section 1221(e) defines good faith as:

> The duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

The building at this location, however, had become somewhat dilapidated and difficult and costly to maintain. The real estate on which it was built (real estate which Denver Buick owned) had substantially appreciated in value and was capable of being used more profitably than as a new car showroom. As a result, in late 1967 or early 1968, Denver Buick considered selling its facilities at that address and moving its dealership to a different location.

In early 1968 General Motors announced that it would conduct a market study of the Denver metropolitan area in order to determine the best areas in Denver for its dealerships from the viewpoint of the interests of both dealers and General Motors. In December of that year General Motors informed Denver Buick that the survey indicated that there were two areas in Denver, one in the north (the Northglenn area) and one in the south (the Littleton area) in which Buick was not represented by a dealership. Denver Buick was offered its choice. Denver Buick rejected the Northglenn area but said that it would "be willing to relocate in the Littleton-Englewood area" at such time as it had sold or leased its present property. In the meantime, it said that it would attempt to find a suitable site or facility in that area. However, Denver Buick was apparently unable to find a Littleton site for the price it was willing to pay or which it deemed suitable. Denver Buick calculated that it would be able to spend $700,000 for land and fixtures on the basis of a 600 unit projected annual new car market in Littleton.

For a year and a half, Denver Buick continued to seek sites in the Littleton area. In September 1969 Denver Buick requested for the first time that it be permitted to forsake Littleton and to relocate on Havana Street in suburban Denver. It claimed that relocation to this address could be accomplished for about half the investment that Denver Buick would have to make in Littleton. Denver Buick insisted that the Havana Street location was exemplary in every way. It reported that, amongst other things, the location had sufficient acreage, proper zoning, a good traffic flow and excellent growth prospects. In spite of Denver Buick's representations, General Motors refused to consent to the Havana Street move.

Denver Buick continued, with General Motors' assistance, to look for a site in Littleton and to do business at the 700 Broadway address. General Motors, through its zone representatives, had agreed that Denver Buick could remain at its old location until that property could be disposed of. Moreover, on July 20, 1970, General Motors offered Denver Buick a new five-year dealer franchise at its 700 Broadway location. Franchises are normally offered for a five-year period and the franchise under which Denver Buick had been operating was scheduled to expire on October 31, 1970. Thus, Denver Buick could have continued a Buick dealership "on [its] locations and premises."

In September 1970 Denver Buick, together with other Buick dealers, met to sign the new agreement. Denver Buick found the renewal agreement to be satisfactory, signed it and returned it to General Motors.[3]

Thereafter, Denver Buick entered into a contract with Blue Cross-Blue Shield medical corporation for the sale of the 700 Broadway property. The sale for $1,750,000 was favorable to Denver Buick, resulting in a profit to it of some $850,000. After Denver Buick advised General Motors of the sale, several meetings were held at which Denver Buick reiterated its request to move to Havana Street, a request which was again denied. Finally, General Motors informed Denver Buick that it had forty-five days

---

**3.** The agreement itself has disappeared. General Motors claims that it ratified the agreement and forwarded it to Denver Buick, while Denver Buick claims that it never received the document.

to find a suitable site in Littleton. General Motors wanted a Buick dealer in the Littleton area because virtually every make of automobile was represented there except Buick.[4] According to Denver Buick, a week after this ultimatum was delivered, General Motors revised its position and gave Denver Buick three days to advise General Motors of its dealership intentions.

On October 19, 1970, Denver Buick itself took the initiative and in a letter signed by Harold Cohan, President, wrote to General Motors as follows:

> Notice is hereby given of the termination of the Denver Buick agreement with General Motors. We have not received our 1971 selling agreement. Denver Buick Incorporated has sold its physical plant on 7th and Broadway, Denver, Colorado. My father and I desired, however, to locate a Buick agency on South Havana, which would not conflict under the agreement, with any other Buick agency, and which was more than five and one-half miles away from any other Buick agency. But for some reason, Buick Motor Division and its agents refused to give us and our corporation this permission, making such termination inevitable.
>
> Our corporation has been a Buick dealer since 1924, and we cannot tell you how dismayed we were with your attitude and autocratic policy.
>
> Thirty-day period waived on termination.

As a consequence of this letter, the relationship between General Motors and Denver Buick terminated.[5]

I.

Since only undisputed facts may be considered in determining whether summary judgment may properly issue as a matter of law, the salient facts will be noted. These facts must be appraised in light of Judge Pickett's admonition that: "A cause of action exists in favor of the dealer only when the unfair and inequitable conduct of the manufacturer amounts to coercion or intimidation." Hanley v. Chrysler Motors Corp., 433 F.2d 708, 712 (10th Cir. 1970).

Denver Buick, not General Motors, elected to terminate its franchise. General Motors had shown its willingness and desire to have Denver Buick continue as a franchise dealer by offering a five-year renewal agreement at its then location.

The renewal was not conditioned upon Denver Buick moving from its premises at 700 Broadway. To the contrary the renewal franchise as offered, was to be at 700 Broadway.

The decision to sell and the sale of the 700 Broadway property were made solely by Denver Buick without any instigation, coercion or threat by General Motors—in fact, without General Motors' knowledge. The sale was made by Denver Buick to advance its own business interests.

The reason ascribed for Denver Buick's termination election was the refusal of General Motors to give its permission for Denver Buick to relocate on Havana Street, thus, according to Denver Buick "making such a termination inevitable." However, Denver Buick itself had made termination inevitable by selling its property and by the necessity of discontinuing a Buick agency at that location.

The trial court in its opinion meticulously listed the material facts as to which it found there were no genuine issues and upon which it based its decision to grant summary judgment. A brief review thereof demonstrates a solid foundation for its decision.

---

4. Dale Buick subsequently became a franchised dealer in the Littleton area shortly after Denver Buick ceased to be a Buick franchisee.

5. Lou Cohan described the motive for sending the letter as follows: "That's the reason we sent that letter in, was that we didn't want to stop Buick from obtaining another dealer." Lou Cohan deposition at 82.

1. Continuance of the "use of the land [700 Broadway] for an automobile dealership was highly questionable as a matter of good business judgment." District Court Opinion at 3 (R. 369).

2. General Motors' survey of the Denver area for new or relocated dealerships indicated two "best potential" locations, Northglenn and Littleton. Denver Buick was offered its choice and chose Littleton.

3. Unable to find a site in Littleton at a price it was willing to pay or which it believed to be suitable, Denver Buick asked for permission to move to Havana Street, which permission was refused.

4. On July 20, 1970 General Motors offered a renewal franchise at 700 Broadway, which Denver Buick signed.

5. Thereafter Denver Buick sold its 700 Broadway property, leaving it with "no place to do business."

6. On October 19, 1970 Denver Buick wrote its letter of termination (previously set forth).

7. "Apart from argumentative conclusory statements by counsel and by the Cohans in their affidavits, there is no evidence in the record showing or reasonably implying that General Motors was not at all times prior to October 19, 1970, ready, willing and able to franchise Denver Buick to continue for a period of five years its Buick dealership at 7th and Broadway in Denver, Colorado . . ." District Court Opinion at 7 (R. 373).

8. As to relocation, Denver Buick was willing to go to a location which "we [Denver Buick] thought was feasible." Harold Cohan deposition at 213.

From these facts it is clear that the controversy boils down to the legal effect of General Motors' refusal to approve Denver Buick's request to establish a dealership at an Havana Street location, this refusal being characterized by Denver Buick as General Motors' "autocratic policy."

Until the end of October 1970, General Motors had had three dealers in Denver—Denver Buick, Deane Buick, and Bill Dreiling Buick. The market survey established that a dealership in each of the four quadrants of the city would be desirable. If Denver Buick chose to leave the downtown area, the northern and southern quadrants were the open locations. In the Littleton or southern area most of the major automobile companies, except Buick, had representation. It was only natural that General Motors also wanted representation for Buick there. For two years Denver Buick had been considering Littleton without coming to any decision. With the abandonment of the downtown area by Denver Buick, General Motors would have found itself with only two Denver dealers, a situation which would have seriously affected sales. In fact, Denver Buick itself showed its realization of the fact that General Motors would want a Littleton dealer. Little wonder then that General Motors wished to have a rapid expression of Denver Buick's intentions after the sale of its downtown Denver property. As the district court said: "This insistence by General Motors cannot be held to be bad faith amounting to coercion or intimidation under the applicable statute . . . ." District Court Opinion at 13 (R. 369).

Weight must be attributed to the parties' own agreement. Denver Buick and General Motors had found 700 Broadway "mutually satisfactory", and Denver Buick had covenanted not to move or establish a different location "without the prior written approval of Buick." The trial judge correctly held that "neither franchise nor statute [gave] them [Denver Buick] a unilateral right to select a new location to their liking." And this should be decisive absent such lack of good faith evidenced by acts of coercion or intimidation as would override the contractual undertaking.[6]

---

**6.** We assume as a matter of law that the ADFA enables us to look beyond the actual terms of the franchise agreement if acts of coercion or intimidation amounting to unfair business practices are established.

■ In an endeavor to find some appellate grievance, Denver Buick attributes General Motors' refusal to approve its proposed move to Havana Street as motivated by a desire to favor another Denver dealer, Deane Buick, over Denver Buick. As asserted error it argues that "The Deane Buick Favoritism Matter was Presented by Appellant and Forgotten by the Trial Court." Denver Buick's Pre-trial Order statement does allege that "Defendant was acting in part at least to favor and protect Deane Buick with respect to the location matter." In support of this assertion Denver Buick relies on a statement by a General Motors zone manager that Denver Buick could not go to Havana Street because it would be in direct conflict with Deane Buick. We must accept the statement as true and then appraise its legal significance.

It is not suggested that either Denver Buick or Deane Buick actually were assigned discrete selling territories. Indeed, both Denver Buick and Deane Buick had the entire Denver metropolitan area as a primary responsibility area and were free to sell to whomever they could persuade to purchase their automobiles. Denver Buick's contention seems directed at the alleged protection of Deane Buick's *location* through refusal to allow Denver Buick to locate nearby.

■ General Motors unquestionably has a vital stake in the locations of its dealerships. Not only must it be concerned with adequate coverage of a market area but also it must attempt to assume the economic viability of its dealerships. It was in General Motors' legitimate interest to have its dealers so located as to best serve the public. To this end, General Motors was entitled to have a survey made and come to its own conclusions as to its dealers' locations. That General Motors was concerned about protecting Deane does not justify an inference that the decision not to permit Denver Buick to locate to South Havana Street was "unfair." Such a decision was in General Motors' own business interests; that these interests may have also coincided with those of Deane Buick is incidental.

■ Just as a would-be dealer has no right to demand that he be given a franchise, neither does he have the right unilaterally to specify an acceptable-to-him location. Since Denver Buick had foreclosed itself from continuing at 700 Broadway and had rejected Northglenn, General Motors quite properly gave it a first preferential choice at Littleton. Fair comment would appear to call for a characterization of this act as one made in good faith (rather than with a lack thereof) toward a reliable dealer of many years. Again by voluntary business decision, Denver Buick declined to accept.

The most that can be said of the controversy is that it was a conflict of business judgments: General Motors' desire to establish a Littleton franchise against Denver Buick's decision that the location was not acceptable.

■■ The ADFA was enacted to protect dealers against unfair practices by manufacturers but only if the practices were evidenced by acts of coercion or intimidation. There is nothing in the Act which gives a dealer the right to dictate the location of its own choosing. And if as a matter of business judgment General Motors decided that its Denver market would be best served by locating dealerships in each of four quadrants, there is nothing as yet in the ADFA which deprives it of that right.

It remains to test the result reached here against the many decisions interpreting, and giving effect to, the ADFA. Most pertinent are the ADFA cases in which summary judgment has been used and the types of coercion or intimidation alleged to be present in them.

## SUMMARY JUDGMENT

Despite the fact that issues of good faith generally would seem best resolved upon a trial, where the facts are undisputed the courts have not hesitated to resort to summary judgment procedure.

In this Circuit several courts have been faced with the problems presented in ADFA cases on motions for summary judgment.

In General Motors Corporation v. The MAC Company, 247 F.Supp. 723 (D.Colo. 1965), the defendant dealer counterclaimed against General Motors for alleged violation of the ADFA. There the trial court (Doyle, then D. J.) had before it (as here) "depositions, answers to interrogatories, admissions and affidavits" as well as scores of exhibits and extensive briefs. Mindful that summary judgment was to be employed with care, the court there said: "where from careful examination of all evidentiary matters presented there can be no reasonable doubt as to the existence of a genuine issue as to material facts, the device of summary judgment is an appropriate method for the disposition of a case." The three counterclaims in issue ranged from termination of a franchise, to failure to renew another and refusal to deliver sufficient automobiles to meet the dealer's needs. The court concluded after it had "reviewed the record in the light of the legal standards set forth in the Automobile Dealers Franchise Act and decisions construing it" (p. 731) that the evidence was legally insufficient to satisfy the standards of the Act and accordingly granted General Motors' motion for summary judgment.

In Hanley v. Chrysler Motors Corporation, 433 F.2d 708 (10th Cir. 1970), this court, after reviewing the purposes of the ADFA as noted in its decision in American Motors Sales Corp. v. Semke, 384 F.2d 192 (10th Cir. 1967), and the circumstances under which a summary judgment motion was permissible for the disposition of the cause, affirmed a grant of summary judgment against a claim that Chrysler had not acted in good faith toward a dealer.

Similar results have been reached in other circuits.

Leach v. Ford Motor Co., 189 F.Supp. 349 (N.D.Cal.1960), was an action by a dealer for an alleged wrongful termination occurring after the dealer had asserted that the manufacturer's plan for stepped-up sales was unreasonable and coercive. The court discharged the jury at the close of plaintiff's case and directed a verdict for the defendant. The court analyzed the evidence and concluded that "any finding to that effect [violation of the ADFA] would be based, not upon substantial evidence, but on mere speculation." (p. 355)

In Woodard v. General Motors Corp., 298 F.2d 121 (5th Cir.), cert. denied, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962), summary judgment was granted in favor of General Motors. The dealer had continually failed to heed General Motors' recommendations to provide adequate premises for a dealership.

In Frank Chevrolet Co. v. General Motors Corp., 304 F.Supp. 307 (N.D.Ohio 1968), aff'd, 419 F.2d 1054 (6th Cir. 1969), summary judgment was granted in favor of the manufacturer upon the pleadings, affidavits, depositions and interrogatories, the court saying:

Yet as here where the entire record conclusively favors the movant on every material issue, where any possible inference favorable to the plaintiff is completely rebutted by undisputed facts in the record and, where additional discovery could not alter these facts, summary judgment is appropriate and warranted. (p. 320)

Much relied upon in many opinions involving the ADFA is Milos v. Ford Motor Co., 317 F.2d 712 (3rd Cir.), cert. denied, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 125 (1963), in which, even after a jury verdict in favor of the dealer, the appellate court reversed and granted judgment for the manufacturer, saying:

[T]he record is devoid of any evidence which would support a jury finding that the termination of plaintiff's franchise resulted from the failure of Ford to act in "good faith" as that term is defined in the Automobile Dealers Day in Court Act. (pp. 718–19)

To the same effect is Garvin v. American Motor Sales Corp., 318 F.2d 518 (3rd Cir. 1963), where after a jury verdict in favor of the dealer the court of appeals reversed:

> The evidence upon which plaintiff relies includes the establishment of a competitive dealership in an area near him, his belief that defendant resented the fact that he bought his parts c. o. d., the insistence on a full-time salesman, the lack of cooperation by the manufacturer in supplying him with cars and parts, and the false charge that he was guilty of "bootlegging" cars.
>
> . . . . .
>
> We are led inexorably to the conclusion that there is no evidence in this record which would support a jury finding that the refusal to renew Garvin's franchise resulted from the failure of the manufacturer to act in "good faith" within the meaning of the Act. (pp. 520–21.)

This principle was reaffirmed in Globe Motors, Inc. v. Studebaker-Packard Corporation, 328 F.2d 645 (3rd Cir. 1964), where despite a jury verdict in favor of a dealer the appellate court reversed:

> We are convinced upon our review of the record in its entirety that the evidence is clearly insufficient to support a factual determination that the appellant failed to act in "good faith" as that term is defined in the Act. (p. 650)

In Berry Brothers Buick, Inc. v. General Motors Corp., 257 F.Supp. 542 (E.D. Pa.1966), the dealer brought an action under the ADFA against the manufacturer for failure to renew its franchise. The trial court, after reviewing all of the dealer's alleged grievances including the charge that Buick's zone manager "was highly favorable to other Buick dealers competing with Berry Brothers", con-cluded that there were "no facts from which a jury could conclude that Buick had not acted in good faith in failing to renew the franchise" and granted defendant's motion for summary judgment. On appeal, the order granting summary judgment was affirmed. 377 F.2d 552 (3rd Cir. 1967).

■ In conclusion, we believe, as did Judge Pickett in Hanley, supra, that "[c]areful consideration of the entire record in this case leaves us without doubt that there was no lack of good faith dealings on the part of" General Motors (p. 712), and that the facts are "such that reasonable men in a fair and impartial exercise of judgment could reach no conclusion other than that liability of the defendant had not been established." Lawrence Chrysler-Plymouth, Inc. v. Chrysler Corp., 461 F.2d 608, 609 (7th Cir.), cert. denied, 409 U.S. 981, 93 S.Ct. 317, 321 L.Ed.2d 245 (1972).

Accordingly, we affirm the judgment on the ADFA claim.

## II.

■ Denver Buick also claims that its Sherman Act allegations were improperly dismissed by the district court. The alleged violations of Section 1 concerned the "location clause"[7] in the standard Buick franchise agreement. Denver Buick contends that the location clause is per se illegal as a restraint of trade. In a sense, we have already addressed this question, since as indicated in Part I of this opinion, we find nothing unfair in the right of General Motors to approve the location of its dealers.

United States v. Arnold, Schwinn & Co., 388 U.S. 365, 376, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), states that:

> [A] manufacturer of a product [for which] equivalent brands of which are readily available in the market may select his customers, and for this pur-

7. The location clause in the franchise agreement provides:

Once dealer is established in facilities and at a location . . . mutually satisfactory to Dealer and Buick, Dealer will not move to or establish a new or different location . . . without prior written approval of Buick.

pose he may "franchise" certain dealers to whom, alone, he will sell his goods.

In Boro Hall Corp. v. General Motors Corp., 124 F.2d 822, 824, reh. denied, 130 F.2d 196, cert. denied, 317 U.S. 695, 63 S.Ct. 436, 87 L.Ed. 556 (1943), the Second Circuit held that the right to franchise necessarily validated the type of location clauses typically included in automobile franchise agreements. The court specifically held that a dealer contract clause could "fix a location for the sale of used cars at a place that did not unduly affect other dealers." This holding with respect to automobile franchises is completely consistent with the holdings of the Courts of Appeals in other franchising cases. For instance, in Colorado Pump & Supply Co. v. Febco, Inc., 472 F.2d 637 (10th Cir.), cert. denied, 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973), this court held that an exclusive dealing contract merely assigning a territory within which the distributor was authorized to sell and which did not mention, much less forbid, sales outside that territory was clearly lawful. *See also* Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76, 80 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963).

There is nothing in the complaint, nor for that matter in the facts subsequently developed by Denver Buick in opposition to the General Motors' summary judgment motion on the First Claim for Relief, indicating that General Motors did anything other than simply assert its rights under the terms of the clause by insisting on the right to approve a new location for Denver Buick. There is no allegation that General Motors assigned territories outside of which dealers could not sell, and in fact the appellant admits otherwise (Br. 57). Accordingly, the Section 1 allegations were properly dismissed, since the location clause is valid as a matter of law, and there are no allegations that would amount to an unlawful use of the clause.

Denver Buick also alleged that General Motors conspired with Deane Buick "to monopolize the Denver metropolitan market in the sale of new Buick and Opel automobiles . . . " in violation of Section 2 of the Sherman Act. This allegation was also properly dismissed.

Section 2 makes it unlawful to conspire to monopolize "any part" of interstate commerce. Specific intent to monopolize is the heart of a conspiracy charge, and a plaintiff is not required to prove what is the "relevant market." It is enough if " 'some appreciable part' of interstate commerce is the subject' of the conspiracy." United States v. Yellow Cab Co., 332 U.S. 218, 225–26, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); United States v. Consolidated Laundries Corp., 291 F.2d 563, 573 (2d Cir. 1961). However, even if we assume that sale of Buicks and Opels in the Denver metropolitan area would qualify under this test, and further that a manufacturer of a branded product, such as a particular make of automobile, not alleged to be unique or dominant, can be found liable for conspiring to monopolize sales of its own product,[8] Denver Buick's complaint is insufficient to establish a violation of Section 2. There is no question that General Motors would have permitted Denver Buick to move to the Littleton area. Presumably this location is within the Denver metropolitan area. Nor is there any allegation that General Motors tried to eliminate Bill Dreiling Buick-Opel, a third authorized Buick dealer in the Denver area. On the basis of Denver Buick's complaint, the best that can be said for its case is that General Mo-

---

8. See Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453, 460 (W.D.Pa.1968), aff'd 417 F.2d 622 (3rd Cir. 1969). *But see* McCormack v. Theo. Hamm Brewing Co., 284 F.Supp. 158, 165 (D.Minn.1968); Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418 (1957).

tors would not allow Denver Buick to move to the location it desired and that this refusal was the result of an agreement between General Motors and Deane Buick. Even if this were so (a contention refuted in Part I of this opinion), in the factual circumstances outlined in this complaint, these allegations fall short of a conspiracy to monopolize.

The judgment of the district court is affirmed.