GOLDEN GATE ACCEPTANCE CORP.,
and Fred Kohlenberg, Appellants,

v.

GENERAL MOTORS CORP., Appellee.

No. 78–3413.

United States Court of Appeals,
Ninth Circuit.

May 23, 1979.

Eli Freed, Freed & Freed, San Francisco, Cal., for appellants.

Martin Anderson, McCutchen, Doyle, Brown & Emersen, San Francisco, Cal., for appellee.

Before BARNES and HUG, Circuit Judges.

BARNES, Senior Circuit Judge:

## I. FACTS

In January of 1974, appellants Golden Gate Acceptance Corporation, the alleged successor in interest to Kohlenberg Cadillac, Inc. (the "Dealership"), and Fred Kohlenberg ("Kohlenberg") brought suit against General Motors Corporation ("GM") stemming from GM's termination of the Dealership's Cadillac franchise in February of 1971. Appellants charged that the termination was in violation of (1) the terms of the "Cadillac Dealer Sales and Service Agreement" ("Agreement") entered into between GM and the Dealership, (2) the Automobile Dealer Franchise Act (15 U.S.C. §§ 1221–1225), and (3) the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2). After two years of discovery by the parties, the district court granted GM's motion for summary judgment.

The controversy between the parties herein centers upon the attempted relocation of the Dealership from its premises at 1000 Van Ness Avenue (the "Premises") to nearby locations. GM initially owned the Premises but sold it to Kohlenberg pursuant to a concomitant arrangement whereby a Cadillac franchise was granted to the Dealership, said franchise grant being conditioned upon the continued operation of the Dealership at the Premises. Kohlenberg owned the stock of and controlled the Dealership. He likewise controlled the Winfield Scott Corporation ("Winfield") in which title to the Premises was vested upon its purchase from GM.[1]

According to the Agreement in effect during the controversy,[2] the location of the franchise was expressly delineated as a very important element of the bargain between the parties. In particular, Section 5B of the Agreement provided, *inter alia,* that:

> . . . in order that Cadillac may establish and maintain an effective network of franchised Cadillac dealers for the sale and service of Cadillac motor vehicles, Dealer shall not, either directly or indirectly, establish any place or places of business for the conduct of any of its Dealership Operations except at the locations and for the purposes described in a current Statement of Dealership Premises. . . .

Within two months of entering into the Agreement, Kohlenberg informed GM that he intended to move the Dealership operations to different locations near to the Premises. Shortly thereafter, GM was notified that the Premises had been rented to the Ford Motor Company ("Ford"). GM had previously discussed the matter with Kohlenberg and warned him that it would terminate the Agreement if the Dealership was moved to a new location without GM's approval and the Premises transferred to any third party. Upon notice of the lease of the Premises to Ford, GM terminated the Agreement effective on the commencement of the lease to Ford.

## II. DISCUSSION

### A. *Standard of Review*

As recently stated by this court in *Yazzie v. Olney, Levy, Kaplan & Tenner,* 593 F.2d 100, 102 (9th Cir. 1979):

> Under Fed.R.Civ.P. 56(c), summary judgment is proper only where there is no

1. In the "Statement of Dealership Premises" ("Statement"), an addendum to the Agreement, Winfield is identified as being "Wholly owned by dealer". The dealer is identified as Kohlenberg Cadillac, Inc.; Kohlenberg signing the Statement as president of the dealer. Likewise, in its corporate minutes, Winfield described itself as taking title to the Premises upon the instructions of Kohlenberg and merely as his agent.

2. GM and the Dealership initially entered into a franchise agreement in 1965 and thereafter in succeeding years until the time of the controversy. The Agreement involved here was for a one year term beginning November 1, 1970 and ending October 31, 1971.

genuine issue of any material fact or where, viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law. . . . Our role in reviewing the grant of summary judgment is to determine whether there is any genuine issue of material fact underlying the adjudication and, if not, whether the substantive law was correctly applied. (Citations omitted.)

*Accord, Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).[3]

### B. *Antitrust Claims*

■ The basis of appellants' antitrust claims is that GM conspired with Olsen Chevrolet ("Olsen") whereby GM would terminate its exclusive territorial franchise agreement with the Dealership "without cause" and substitute Olsen in its place. No allegation or evidence as to an adverse effect upon competition was presented by appellants other than the fact that one distributor would be replaced by another.

■ It has been consistently held in this circuit that it is not a violation of the Sherman Act for a manufacturer to conspire with others to simply switch distributors at one of its exclusive franchises and to cease doing business with a former dealer. *Dreibus v. Wilson,* 529 F.2d 170, 172 (9th Cir. 1975); *Alpha Distrib. Co. of Cal., Inc. v. Jack Daniel Distillery,* 454 F.2d 442, 452 (9th Cir. 1972); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 76 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *cf., Marquis v. Chrysler Corp.,* 577 F.2d 624, 639–41 (9th Cir. 1978); *accord, Fray Chevrolet Sales, Inc. v. General Motors Corp.,* 536 F.2d 683, 686 (6th Cir. 1976) —(involving a similar GM franchise agreement). Thus, as a matter of law, the appellants' antitrust charges in their complaint failed to state a claim under the Sherman Act.[4] Moreover, it is clear from the record below that, even given the requisite presumptions in appellants' favor, GM's termination of the Agreement was caused directly and justifiably by Kohlenberg's and the Dealership's breach of the Agreement.[5]

**3.** While no objection was raised by either counsel to the absence of findings of fact and conclusions of law by the district court, we note that such findings are permissible and preferable. We urge their use because "it would be helpful to the parties and to the reviewing court if the recitation of findings set forth the facts with respect to which no genuine material issue exists and the reasons why on those facts summary judgment is proper. Wright & Miller, Federal Practice and Procedure: Civil § 2575 at 692–93 (1971)." *Abramson v. University of Hawaii,* 594 F.2d 202, 210 (9th Cir. 1979).

**4.** Appellants also raised an issue as to the validity of the location restrictions in the Agreement. They relied primarily upon the Supreme Court's grant of *certiorari* in *GTE Sylvania Inc. v. Continental T.V., Inc.,* 537 F.2d 980 (9th Cir. 1976), prior to the Court's decision on that case. The Court subsequently affirmed this circuit's decision in that case which held that vertical restraints in the form of location restrictions are to be governed by the "rule of reason" rather than found to be a *per se* violation of the antitrust laws. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 629 (1977). Appellants, however, failed to raise any genuine issue as to an unlawful anticompetitive effect of GM's loca-

tion requirement or its exercise in this case. A location clause in a franchise agreement which prohibits a dealer from moving to another site without the approval of the manufacturer is not an illegal restraint of trade where, as here, the initial location was agreed to by both parties and the manufacturer's intent was to provide an effective network of qualified sales and service dealerships. *Salco Corp. v. General Motors Corp., Buick Mot. Div.,* 517 F.2d 567, 575 (10th Cir. 1975); *Norman M. Morris Corp. v. Weinstein,* 466 F.2d 137, 143 (5th Cir. 1972). Indeed, under the Section 5B of the Agreement, the Dealership was "free to sell Motor Vehicles, Parts and Accessories to customers wherever they may be located." The location requirement was merely GM's method of assuring an effective network of dealerships which meet GM's standards for franchise operations.

**5.** Appellants contend that the dismissal of the antitrust claims by the district court was based upon its finding of a failure by plaintiffs to state a claim pursuant to Rule 12(b) of the Federal Rules of Civil Procedure ("FRCP"). However, the court's order nowhere mentions Rule 12(b) or a motion to dismiss but rather states that it grants GM's motion for summary judgment. Moreover, it is clear from the record that the district court relied upon matters

Consequently, the district court's grant of summary judgment as to the antitrust claims was proper.

## C. *Breach of Contract Claims*

■ Initially, it is noted that, despite appellants' contentions to the contrary, the location provisions of the Agreement are definitely unambiguous and were violated by Kohlenberg's and the Dealership's attempts to conduct franchise operations at sites other than the Premises or those approved by GM. However, we do agree with the appellants that the Agreement is ambiguous as to whether such a violation, by itself, would give GM the right to immediately terminate the Agreement.

Section 11B of the Agreement, which delineates those acts or events which are so contrary to the spirit of the Agreement "as to warrant its termination", does not include in its ten subparagraphs any direct reference to the act of relocating the franchise operations. Such a move, without GM's approval, undoubtedly violates Section 5B of the Agreement and arguably the primary objectives of the contract as described in its "General Purpose" Section. However, Section 11C of the Agreement specifically covers non-performances by a dealer's failure to "fulfill its responsibilities or obligations as to Dealership Locations and Premises under provisions of Section 5 of this Agreement." GM's recourse for violations under Section 11C would be to terminate the Agreement but only if the violation continued for six months and thereafter only upon written notice. Thus, the appellants argue that, despite their breach, GM also violated the franchise contract by immediately terminating the Agreement rather than waiting the requisite six months.

Nevertheless, the record reveals that GM's justification for the immediate termination was based not solely upon the attempted relocation of the Dealership, but primarily upon the leasing of the Premises to Ford. According to Section 11B, subparagraph 6:

> The following represent acts or events that originate at or with Dealer or its Dealer Operators or Owners and over which Cadillac has no control but which are so contrary to the spirit, nature, purposes or objectives of this Agreement as to warrant its termination:
>
> \*    \*    \*    \*    \*    \*
>
> (6) . . . any sale or transfer, by operation of law or otherwise, to any third party or parties of the principal assets of Dealer that are required for the conduct of Dealership Operations.

Kohlenberg was listed in the Agreement as both "Owner" and "Dealer Operator". The Premises was a "principal asset" required for the conduct of the Dealership Operations since the Agreement specifically limited GM's grant of the franchise to the Dealership for the contract period so long as it operated at the Premises. Likewise, the transfer definitely "originated at or with" the "Dealer Operator" (Kohlenberg). Appellants claim that the Premises was owned by Winfield and thus the lease to Ford did not effect an "asset of the Dealer". However, in the Agreement, Winfield is delineated as being "Wholly owned by dealer". Moreover, it is undisputed that Winfield held the property merely as an agent for Kohlenberg and that Kohlenberg was the owner and operator of the Dealership, both in fact and within the coverage of Section 11B. Alternatively, the lease of the Premises to Ford clearly constituted a transfer of the Dealership's right to conduct its operations at the agreed location. By failing to secure an approved site prior to the lease, the Dealership effectively transferred one of its "principal assets", namely the right of possession to property which would satisfy the requirements for "Dealership Premises" as defined in Section 1 of the Agreement. GM was therefore entitled to immediately terminate the Agreement following the lease of the Premises to Ford.

outside of the pleadings and thus its order is to be treated under Rule 56 of the FRCP. *Whitner v. Davis*, 410 F.2d 24, 27 (9th Cir. 1969), *see also* Rule 12(b) of the FRCP. This distinction is

noted in response to appellant's argument that the district court was required to accept the allegations in the complaint as true under a Rule 12(b)(6) motion.

Appellants attempted to raise a "genuine issue of material fact" by alleging: (1) that Kohlenberg's "understanding" of the terms of the Agreement differed from that which GM asserted in terminating the Agreement, and (2) that a GM employee had, prior to the execution of the Agreement, stated that the dealership location could be moved to a nearby location if the Premises proved unsatisfactory.[6]

■ It is initially noted that Section 23 of the Agreement provides, *inter alia*, that:

There are no other agreements or understandings, either oral or in writing, between the parties affecting this Agreement. . . .

This Agreement cancels and supersedes all previous agreements between the parties relating to the subject matters covered herein.

Given the above cited language, the contract must be considered "integrated" and, because the parties have agreed that the written instrument is the exclusive and final embodiment of their contract, antecedent understandings and parol evidence are not admissible to alter its terms. *See, Clayman v. Goodman Properties, Inc.,* 171 U.S. App.D.C. 88, 95, 518 F.2d 1026, 1033 (1973); 3 *Corbin on Contracts* § 573 at 368 (1960); § 1856 California Code of Civil Procedure. Likewise, because we find the Agreement to be unambiguous in regards to the provisions involved herein, we may not resort to alleged antecedent understandings or parol evidence to create a genuine issue of fact as to the meaning of those provisions. *Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 543 (9th Cir. 1975).

Thus, granting GM's motion for summary judgment as to the breach of contract claim was proper.

D. *Automobile Dealer Franchise Act Claims*

■ Appellants argue that GM did not act in good faith, as the term is defined in 15 U.S.C. § 1221[7], because: (1) "it arbitrarily terminated the franchise of Kohlenberg Cadillac in violation of the provisions of the dealer agreement" and (2) it threatened to cancel the Agreement if the Dealership was moved despite the fact that Kohlenberg had informed GM that he was losing money due to the difficulty of operating the franchise at the Premises. Since we previously found that the termination was proper under the terms of the contract[8], the only possible issue as to GM's good faith is its insistence upon a specific location for the operation of the franchise.

The location of the franchise was initially agreed to by both GM and Kohlenberg. When Kohlenberg notified GM of the Dealership's proposed move, the new location which he chose, while near to the Premises, consisted of three separate sites rather than a single site. GM was hesitant to agree to such a splitting of franchise operations. Moreover, Kohlenberg eventually presented the move to GM as a *fait accompli* after having leased the Premises prior to securing GM's approval of an alternative site as he was required to do under the contract. It was at that time that GM terminated the Agreement and secured a new distributor (Olsen). As noted in *Salco Corp. v. General Motors Corp., Buick Motor Division,* 517 F.2d 567, 573 (10th Cir. 1975): "There is

---

**6.** However, in his deposition, Kohlenberg admits that the GM representative had stated that the franchise could only be moved "if Cadillac approved the new facility".

**7.** "Good faith" is defined in 15 U.S.C. § 1221(e) as follows:

The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party:

*Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

**8.** The mere notification by an automobile manufacturer that it expects a dealer to comply with the essential terms of the franchise agreement or face termination as provided in the contract is not improperly coercive or intimidating especially after, as in this case, a dealer has evidenced an intent to breach a provision of the franchise agreement.

nothing in the [Automobile Dealer Franchise] Act which gives a dealer the right to dictate the location of its own choosing." Likewise, there is nothing in the Act which would deprive GM of making business judgments as to locations of its franchises. *Id.; cf., Kaiser v. General Motors Corp. (Pontiac Motor Div.),* 396 F.Supp. 33, 42 (E.D.Pa. 1975); *aff'd. mem.,* 530 F.2d 964 (3rd Cir. 1976). GM did not act in bad faith by initially requiring that the Dealership be located at a specified (and previously agreed to) site. Thereafter, Kohlenberg prompted GM's actions by unilaterally breaching the location provision of the Agreement.

### III. CONCLUSION

The district court's grant of GM's motion for summary judgment is affirmed as to all of appellants' claims.